**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **LARRY F. BOYD,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 7:04-CV-0112-BF (R)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

The District Court transferred this case to the United States Magistrate Judge pursuant to the consent of the parties. This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Larry F. Boyd ("Plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and supplemental security income ("SSI") under Title XVI of the Act. The Court considered "Plaintiff's Brief on Appeal from the Decision of the Commissioner," "Defendant's Brief," and "Plaintiff's Reply Brief," all of which were filed on December 14, 2004. The Court has reviewed the parties' evidence in connection with the pleadings. The final decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings.

**I.** **Background**[1]

**A.** **Procedural History**

Plaintiff filed the application which is the subject of this appeal on March 15, 1999. (Tr. 74-6.) He alleged that he was not able to work after February 1, 1999, due to a pinched nerve in the lower spine, seizures, headaches, dizziness, blurred vision, arthritis, and spurs in his neck. (Tr. 87.)

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

The application was denied initially and was denied again upon reconsideration. (Tr. 49-57, 58-63.) Plaintiff then requested a hearing. After a hearing on April 27, 2000, Tela L. Gatewood, United States Administrative Law Judge ("ALJ"), found that although Plaintiff could not perform his past relevant work, he could perform other work which exists in significant numbers in the economy and was not disabled between February 1, 1999, and May 16, 2001. (Tr. 32-45.)

Plaintiff sought review of the ALJ's May 16, 2001 decision denying benefits. The Appeals Council refused to review the ALJ's decision, thereby making the ALJ's unfavorable decision the Commissioner's final decision. (Tr. 6.) Plaintiff immediately filed a new application for benefits. (Pl.'s Br. at 3.) While this case was pending before the Appeals Council, the ALJ approved the new application with an onset date of May 17, 2001, the date after the ALJ's unfavorable decision in this case. (*Id*., Exh. A.) On June 1, 2004, Plaintiff filed this appeal.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence and is contrary to law. The Commissioner counters that substantial evidence supports the ALJ's decision, and that she applied the correct legal standards. (Def.'s Br. at 3.) Additionally, the Commissioner contends that the subsequent decision determining disability effective May 17, 2000, must have been based upon a new impairment, and that the new evidence is irrelevant to this application. (*Id*.) Plaintiff replies that the subsequent notice of benefits does not indicate the basis for the favorable decision. (Pl.'s Reply Br. at 2.) He further contends that the Appeals Counsel failed to follow its own regulations when it failed to review the subsequent decision and its supporting documentation to determine whether that evidence should have been considered by the ALJ in this case. (*Id*.)

### B.       Factual History

### 1.       Plaintiff's Age, Education, and Work Experience

Plaintiff was born on January 21, 1949.  (Tr. 300.)  He was 50 years old on the date of the alleged onset of his disability and 52 years old at the time of the ALJ's decision.  He completed high school, and  had past relevant work as a plumber and plumber's helper.  (Tr. 301-02.)  These jobs have a strength factor of heavy and are classified vocationally as either skilled or semi-skilled.  (Tr. 330.)  Plaintiff met the Act's insured status requirements.  (Tr. 30.)

### 2.       Plaintiff's Medical Evidence

When Plaintiff suffered a low back injury in the 1970's, surgeons performed a laminectomy. (Tr. 145, 316.)  Plaintiff continued working as a plumber for more than twenty years after the surgery.  (Tr. 302.)  He suffered a seizure in April, 1992, and an ambulance took him to the emergency room. (Tr. 128.) The examining physician suspected that the seizure might be connected to alcohol withdrawal.  (*Id.*)

In 1996, Plaintiff complained of neuropathy in his left lower extremity.  (Tr. 150.)  An MRI showed evidence of a prior laminectomy at the L5-S1 level and a diffuse disc bulge which extended laterally to the left, contacting the L5 nerve root.  (*Id.*)  Mild ligamentous hypertrophy was noted at the L4-5 level.  (*Id.*)  X-rays one year later showed degenerative joint disease of the thoracic spine, narrowing of disc spaces with osteophyte formation involving the lower cervical spine, mild levoscoliosis, narrowed L5 disc space, and osteophytes at L5-S1 which were compatible with degenerative disc disease.  (Tr. 144-45.)  The x-rays also showed arteriosclerotic changes of the aorta.  (Tr. 147-48.)

When Plaintiff suffered another grand mal seizure in October, 1998, an ambulance took him

3

to Bowie Memorial Hospital.  (Tr. 132.)  He complained of weakness, dizziness, and difficulty

remembering.  (*Id*.)  Bystanders reported that he had hit his head when he fell during the seizure.

(*Id*.)  An EKG was administered, and it was borderline with a slow R-wave progression.  (Tr. 133.)

Veteran's Administration ("V.A.") doctors treated Plaintiff for his seizures and prescribed

Dilantin.[2]  (Tr. 197-99.)  In November, 1998, Plaintiff suffered another seizure and his Dilantin was

increased to 400 mg per day.  (Tr. 198.)  In December, 1998, when he suffered another seizure, his

doctors increased his dosage to 300 mg in the morning and 200 mg in the afternoon.  (Tr. 197.)

On January 15, 1999, Plaintiff complained of petit mal seizures that occurred at least weekly

and that increased in frequency.  (Tr. 200.)  He reported recurring headaches, with associated visual

changes, which lasted all day.  (*Id*.)  He also complained of chronic back pain and Chronic

Obstructive Pulmonary Disease ("COPD").  (*Id.*)  The doctor again increased his dosage of Dilantin,

prescribing 300 mg twice a day.  (*Id*.)  According to the *Merck Manual of Diagnosis and Therapy*[3]

("*Merck*"), this level exceeds the ususal dosage.  (Pl.'s Br. at 4, *Merck* at 1372.)

On January 27, 1999, Plaintiff reported to the V.A. doctor that he had suffered two seizures

since his last appointment.  (Tr. 186.)  The V.A. doctor reduced his Dilantin to 500 mg per day and

added another medication.  (*Id*.)  Plaintiff also reported neck pain and recurring headaches.  (*Id*.)

The doctor prescribed a cervical collar and scheduled additional tests.

Plaintiff stopped working on February 1, 1999, due to the combined effects of his seizures,

neck and back pain, numbness of his left leg, severe headaches, dizziness and vision problems, and

---

[2]  Some of Plaintiff's medical records from the V.A. are missing, but the Commissioner
does not dispute that the V.A. doctors had prescribed Dilantin for Plaintiff's seizures.

[3] *The Merck Manual of Diagnosis and Therapy* 1372 (15th ed. 1987).

4

a frequent inability to focus.  (Tr. 87, 183, 301.)  In February, 1999, a brain scan eliminated a brain tumor as the cause of his symptoms.  (Tr. 183, 200.)

On February 29, 1999, Plaintiff complained of pain in his neck and head.  (Tr. 192.)  Plaintiff was also suffering from COPD.  (Tr. 164-65.)  On March 1, 1999, Dr. Guduguntla, the doctor at the V.A. Hospital in Bonham, Texas, completed a form for food stamps showing that Plaintiff was disabled by severe degenerative joint disease of the cervical spine and a history of a seizure disorder. (Tr. 187.)

In March, 1999, Plaintiff complained of neck pain, left leg numbness, bad headaches, and blurry vision.  (Tr. 190.)  His 300 mg of Dilantin twice a day was helpful to the extent that he had not had a grand mal seizure for two to three months.  However, he reported some shaking palsy. (*Id.*)

An April 29, 1999 report on an MRI of the cervical spine revealed the following:

1. Stepoff at the C5/6 levels with bulging disc narrows the sagittal diameter of the canal to 10 mm at the C5/level and 9 mm at the C6/7 level.  Neural foraminal narrowing is noted at both of these levels.  2. C3/4 left disc protrusion and spur narrows left neural foramina.  3. Mild bulge at C3/4 without neural foraminal or canal stenosis.

(Tr. 169-70.)  The V.A. granted Plaintiff non-service connected disability from April 22, 1999, due to degenerative joint disease of the cervical and lumbar spine, a seizure disorder, and hypertension. (Tr. 124.)

During late 1999 and 2000, Plaintiff continued to suffer from neck and back pain and from bronchitis.  (Tr. 213-14.)  The treating physicians at the V.A. prescribed a number of medications for Plaintiff including heavy doses of the anti-convulsive Dilantin, Gabapentin (another anti-convulsive drug), Lisinopril for hypertension, pentoxifylline for circulation, an analgesic cream for

muscle pain, 800 mg ibuprofen for pain, cyclobenzaprine for muscle spasms, and Guaifenesin for his cough.  (Tr. 105-10.)  During this time he had high blood pressure, an abnormal EEG which showed generalized slowing during wakefulness, and according to some notes, encephalopathy.[4] (Tr. 212, 215.)

Plaintiff experienced severe throbbing headaches in early 2000.  (Tr. 215.)  The doctors at the Neurology Epilepsy Clinic at the V.A. Hospital noted that although his grand mal seizures were controlled with anticonvulsants, he continued to have "smaller episodes of blurry vision, throbbing, arms, [and] confusion" two to three times per week.  (*Id.*)  One doctor thought these might be a prelude to a grand mal seizure.  (*Id.*)  The doctor also noted weekly staring spells and thought them to be probable breakthrough events of the complex partial seizures or possibly a dissociative phenomena.  (*Id.*)  The doctors increased his Dilantin to 300 mg in the morning and 250 mg in the afternoon and the Gabapentin was continued at the dose of 800 mg.  (*Id.*)

In May, 2000, Plaintiff's "staring spells" had been reduced, but he had more memory problems and dizziness.  (Tr. 238-39.)  His headaches had improved with Neurontin.  (*Id.*)  His treating physician diagnosed "complex partial seizures, intractable."  (*Id.*)  His doctor warned him not to drive and told him to avoid heights.  (*Id.*)  He also restricted Plaintiff from swimming, bathing, or cooking alone, operating heavy machinery, or handling hazardous materials.  (*Id.*)

An agency medical consultant examined Plaintiff on June 6, 2000.  (Tr. 226-33, 262.)  Dr. Gary Evans noted Plaintiff's history of grand mal seizures which were, by then, occurring infrequently (one to two a year).  (*Id.*)  However, he also noted that Plaintiff had frequent episodes of dizziness and confusion which might be complex partial seizures, non-generalized.  (*Id.*)  Plaintiff

---

[4]  Again, the Court notes that the V.A. records were not complete.

told the physician that he no longer drives, and does not have a driver's license. (*Id.*) At the time of the examination, Plaintiff was taking three anti-seizure medications, Dilantin, Gabapentin, and Lamatrizine. (*Id.*) Plaintiff told the doctor that he had significant problems thinking and felt like he was in a daze most of the time. (Tr. 226.)

Plaintiff described the chronic pain, numbness, and stiffness in his back from herniated discs and a prior surgery which made it difficult for him to walk. (*Id.*) He could walk only 50 to 75 feet because of pain, and his standing was also restricted. (*Id.*) He related that he spent much of his time lying down because sitting was also uncomfortable for him. (*Id.*) Plaintiff wore a cervical collar, and took anti-inflammatories and muscle relaxants to help relieve the pain. (*Id.*)

Upon examination, Dr. Evans stated that Plaintiff's seizures were not well-controlled because he had breakthrough seizures several times weekly. (Tr. 228.) He concluded that Plaintiff's lumbar disc problems with lumbar disc syndrome involving the left leg compromised Plaintiff's ability to stand and walk and caused him chronic pain. (*Id.*) He remarked that Plaintiff had a history of hypertension, with poor control. (*Id.*) He also noted probable COPD, secondary to long time cigarette smoking and a history of alcohol abuse, with a possible association to Plaintiff's seizure problems. (*Id.*)

Dr. Evans evaluated Plaintiff's ability to perform work-related activities and established the following limitations based on Plaintiff's back and neck pain from disc disease and his seizures:

1)      Lifting limited to five pounds occasionally;

2)      Standing and walking limited to less than 2 hours in an 8-hour day;

3)      Sitting limited to less than 6 hours in an 8-hour day;

4)      No climbing, balancing, stooping, crouching, kneeling, crawling;

5)      Limited pushing and pulling;

6)      Avoidance of heights, moving machinery, temperature extremes, fumes, chemical exposure, and vibration.

(Tr. 232-33.)

An agency examining consulting neurologist, Dr. Stephen Farmer, examined Plaintiff two weeks later. (Tr. 219-20.) Dr. Farmer noted that the history revealed a few tonic/clonic seizures with convulsive activity and blurring of vision and other minor seizures, with staring activity and picking and pulling at the face and arm. (*Id.*) Dr. Farmer reported that Plaintiff continued to have seizures several time a week, despite his taking three anti-convulsant medications. Dr. Farmer found, upon examination, that Plaintiff had some decreased sensation in the lower extremities, as well as reduced deep tendon reflexes. (*Id.*) The neurologist concluded that Plaintiff suffered from partial complex seizures of an unknown etiology. He noted that the exact frequency of these seizures was difficult to fully ascertain. He found the seizures were not entirely controlled. The neurologist also concluded that Plaintiff suffered from chronic low back pain secondary to discogenic and osteoarthritic disease with some restrictions of his range of motion. (Tr. 220.)

Dr. Farmer's assessment of Plaintiff's ability to do work-related activities was as follows:

1)      Lifting limited to twenty pounds occasionally and less than ten pounds frequently;

2)      Standing and walking limited to less than 2 hours in an 8-hour day;

3)      Sitting was not limited, but the worker would require frequent breaks;

4)      No climbing, balancing, or crawling, and only occasional stooping, crouching, and kneeling;

5)      Avoidance of heights, moving machinery, temperature extremes, dust, fumes, and chemical exposure.

(Tr. 223-24.)

From May to September, 2000, Plaintiff returned to the Neurology Epilepsy Clinic at the V.A. Hospital, complaining of blurry vision, insomnia, and breathing problems.[5] (Tr. 234- 35.) His minor seizures continued. (*Id*.) He had staring spells and right hand fidgeting two to three times per week. (*Id*.) His medication was adjusted. (*Id*.)

On September 11, 2000, Plaintiff suffered a transient ischemic attack ("TIA") or cardiovascular accident ("CVA"). (Tr. 281.) He had difficulty swallowing and numbness and paresthesia of the left lower face, left arm, and left leg. (*Id*.) A Doppler test showed stenosis of both carotid arteries and the doctors suggested surgery. (*Id*.) The symptoms recurred on September 22, 2000. (Tr. 276.) By October, the episodes happened frequently and seemed to be brought on by activity, especially walking. (*Id*.) Plaintiff reported that after one of these episodes, he had to rest thirty minutes to recover the sensation in the left side of his body. (*Id*.) The doctors concluded the episodes were probable TIAs, secondary to thrombotic events, not associated with carotid stenosis. (Tr. 273-75.)

The record contains two reports that were also submitted in connection with Plaintiff's successful application for benefits. (Tr. 11-29.) Plaintiff's doctors conducted a pulmonary function test on November 1, 2001, five months after the ALJ's decision. (Tr. 25-6.) The results showed severe breathing problems with spirometry readings low enough to meet the requirements of the Social Security Listing of Impairments ("Listings"), 20 C.F.R. Part 404, subpt. P, app. 1, § 3.02(A) (2004).

---

[5] These medical records, dating from May 3, 2000, to September 7, 2000, were furnished after the ALJ conducted her hearing, but before her decision.

Dr. E. R. Chandler performed a consultative examination on November 2, 2001. (Tr. 18-23.) His examination revealed tenderness and muscle spasms in the neck and back. (*Id.*) Plaintiff's balance problems prevented him from performing a heel and toe walk. (*Id.*) He walked with a shuffling gait and used a cane. (*Id.*) Straight leg raising was positive at 30 degrees on both sides. Additional testing was positive for orthopedic and neurological impairments. (*Id.*) X-rays revealed spondylolysis and spondylolisthesis of both the cervical and lumbar spine. (*Id.*)

### 3. **Plaintiff's Hearing**

At Plaintiff's hearing on April 27, 2000, Plaintiff appeared in person and was represented by counsel, Jean Bishop. (Tr. 297.) A Vocational Expert ("VE"), Clifton King, and a witness, Sue Davis, also testified. (*Id.*)

At the hearing, Plaintiff described the symptoms he experienced from his seizure disorder. (Tr. 311.) He explained that although his grand mal seizures were controlled by medication, he continued to suffer other seizures during which he would lose track of time. (*Id.*) He did not know the episodes were happening, but his friend Sue Davis, who testified at the hearing, described them as periods during which he became non-responsive and simply sat and stared. (*Id.*) She said that Plaintiff's eyes would become glassy during these spells and that the episodes themselves lasted only five to ten minutes. (*Id.*)

Ms. Davis testified, however, that Plaintiff did not begin to recover from the spells until twenty to forty-five minutes later. (Tr. 326-27.) Both Plaintiff and Ms. Davis testified that he was confused and physically tired for hours after these episodes and that he would have to lie down and sleep for three to four hours to fully recover. (Tr. 313-14, 328.) Ms. Davis thought that the lengthy recovery from these seizures would make working difficult. (Tr. 328.) The staring episodes

10

occurred two to three times per week.  (Tr. 312, 326.)

Plaintiff also testified about his spells of dizziness and blurred vision which also happened several times a week.  (Tr. 307, 312.)  He testified he had difficulty thinking and problems with his memory.  (*Id*.)  He said he felt like he was in a daze.  (*Id*.)

Additionally, Plaintiff testified about his back and leg pain.  (Tr. 316-18.)  He described a sharp pain from his back that would shoot down his left leg, and he said that the leg then became numb.  (*Id*.)  To relieve his pain, he would lie down and use medication, rubs, and a heating pad.  (Tr. 319.)  He cried when the pain became severe.  (Tr. 318.)  Plaintiff testified that he could walk only 50 to 75 feet, could sit only thirty minutes at a time, could lift no more than a gallon of milk, and could not do any housework or fix meals.  (Tr. 306, 319- 20, 323.)  His testimony was consistent with the documentary evidence.  (Tr. 86, 97, 100, 104-09.)

The ALJ asked the VE whether he could identify any occupations that an individual could perform, assuming that the individual of the same age, education, and work experience as Plaintiff would be capable of lifting or carrying a maximum of 40 pounds (20 pounds on a frequent basis), and assuming that the individual would not be able to work at unprotected heights or around hazards, and would not be able to climb ladders, ropes, or scaffolds.  (Tr. 330.)  The VE testified that the individual would not be able to perform a full range of medium work, but there were jobs in the light work category that the individual could perform.  (Tr. 330-31.)  He named cafeteria attendant, wire stripper, hand packager, and housekeeper.  (*Id*.)  The ALJ asked the VE if skills acquired from Plaintiff's work history would be transferrable to any sedentary jobs.  (Tr. 331.)  The VE testified that the utilization of hand tools and soldering would be transferrable to sedentary jobs such as solderer, polisher, and lock assembler.  (*Id*.)

11

**C.**     **The ALJ's Findings**

The ALJ issued an unfavorable decision on May 16, 2001.  (Tr. 35-45.)  The ALJ found that Plaintiff had severe impairments of degenerative changes of the spine, a history of a seizure disorder, tobacco dependence with chronic bronchitis, alcohol dependence, and hypertension.  (Tr. 39.)  She gave limited credibility to Plaintiff's allegations and testimony about his limitations.  (Tr. 41.)  She decided that although Plaintiff could not perform his past work as a plumber, he was not disabled because he had the residual functional capacity ("RFC") to perform a wide range of light and sedentary work.  (Tr. 43.)

**II.**     **Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act.  *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* In this case, step five was the last step in the proceedings because the Commissioner determined that Plaintiff could not perform his past relevant work, but that he had the residual functional capacity for a wide range of light and sedentary work.

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### III.   Analysis

#### A.   The Appeals Council's Failure to Consider the New Evidence

Plaintiff argues that reversal and remand is required because the Appeals Council failed to address adequately the new evidence presented to it.  The Social Security statute and the regulations, when read in conjunction with one another, require the Appeals Council to consider evidence presented to it for the first time when the evidence is new and material.  *Rodriguez v. Barnhart*, 252 F. Supp. 2d 329, 336 (N.D. Tex. 2003).  *See* 20 C.F.R. § 404.970(b).

Plaintiff submitted to the Appeals Council two reports that were also submitted in connection with Plaintiff's successful application for benefits.  (Tr. 11-29.)  Plaintiff's doctors conducted a pulmonary function test on November 1, 2001, five months after the ALJ's decision.  (Tr. 25-6.)  The results showed severe breathing problems with spirometry readings low enough to meet the requirements of the Listings.  *See* 20 C.F.R. Part 404, subpt. P, app. 1, § 302(A) (2004).

Dr. E. R. Chandler performed a consultative examination on November 2, 2001.  (Tr. 18-23.)  His examination revealed tenderness and muscle spasms in the neck and back.  (Tr. 20.)  Plaintiff's balance problems prevented him from performing a heel and toe walk.  (*Id*.)  He walked with a shuffling gait and used a cane.  (*Id*.)  X-rays revealed spondylolysis and spondylolisthesis of both the cervical and lumbar spine.  (*Id*.)  Dr. Chandler's assessment was as follows:

> Cervical osteoarthritis.  Cervical spondylolysis and spondylolisthesis with chronic pain and limited use of his arms.  Osteoarthritis, spondylolysis and spondylolisthesis of the lumbar spine resulting in a shuffling gait and the need for a cane for support.  Chronic bronchitis with COPD and shortness of breath.  Seizure disorder on Dilantin therapy.

(Tr. 21.)  In the subsequent case, the ALJ found that Plaintiff was disabled effective May 17, 2001, whereas in this case, Judge Gatewood, who discredited Dr. Chandler's earlier assessment of

14

Plaintiff, found that Plaintiff was not disabled as of May 16, 2001. This case was before the Appeals Council when the favorable decision was rendered. The favorable decision should have been sent to the Appeals Council immediately for it to consider the evidence on the subsequent application to determine whether there was new and material evidence relating to the claim in this case. *See Adkins v. Barnhart*, No. Civ.A.2:02-0087, 2003 WL 21105103, at *3 (S.D. W. Va. May 5, 2003); *Barrientoz v. Massanari*, 202 F. Supp. 2d 577, 587 (W.D. Tex. 2002) ("The purpose of SSA-EM-99147 is to expedite the consideration of prior claims once a subsequent award of benefits is granted and the claimant maintains the evidence on which it was based relates to the time period for his prior claim."). *See also* SSA POMS SI 04040.025, 2002 WL 1879213 (SSA-POMS), specifying the procedure when a subsequent claim for SSI is filed.

Nevertheless, the Commissioner claims that the new decision must have been based entirely upon the Pulmonary Function test, and therefore, the new evidence and new decision are not relevant. The Commissioner relies upon *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999). In *Wilson*, the Court found that a doctor's opinion that a claimant was disabled one year after the ALJ's decision was not probative of any issue in that case. *Id*. *Wilson* is not instructive under the circumstances of this case.

The Commissioner has violated her own policy because the appeal was pending before the Appeals Council when the new decision was issued. Reconsideration is required because there is no indication in the record that Plaintiff experienced a sudden onset of physical limitations or a sudden deterioration in his condition between May 16, 2001, and May 17, 2001. The medical records for the period in question here show that Plaintiff had longstanding pulmonary problems and COPD. On February 29, 1999, Plaintiff's treating physician noted that he was suffering from

15

COPD.  (Tr. 164-65.)  From May to September, 2000, Plaintiff returned to the Neurology Epilepsy Clinic at the V.A. Hospital, complaining of blurry vision, insomnia, and breathing problems.  (Tr. 234-35.)  Moreover, Plaintiff's combination of severe impairments, including his minor seizures two to three times a week that were not controlled by medication, should have been considered in light of the new evidence.  The Commissioner's failure to follow its own regulations in connection with the new evidence requires reversal and remand.  Plaintiff suffers from a combination of slowly progressive impairments.  On remand, if necessary, the Commissioner should obtain evidence from a Medical Expert to clarify the nature and severity of Plaintiff's impairments and to determine the onset date of Plaintiff's disability.  CFR §§ 404.1527(f) and 416.927; SSR 96-6p.

### B.   The ALJ's Decision that Plaintiff's Partial Complex Seizures Were Not Severe and Intractable is Not Supported by Substantial Evidence, and the ALJ Failed to Apply the Correct Legal Standard in Evaluating the Evidence

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusion.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).  The ALJ is required to consider all the evidence in making her determinations.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  "[She] cannot 'pick and choose' only the evidence that supports [the ALJ's] position."  *Id*.

Furthermore, the standard for establishing a severe impairment is not burdensome: "[A]n impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  *Id*. at 392.  *See also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).  Under this definition, Plaintiff's complex partial seizures constituted a severe impairment from February 1, 1999, to May 16, 2001.  Although the ALJ considered a

"history of seizures" to be a severe impairment in this case, the ALJ erred by failing to recognize that Plaintiff suffered from two types of seizures: grand mal seizures, which appeared to be controlled by medication except for one or two seizures per year, and complex partial seizures, which he suffered at least once a week and which his treating physician diagnosed as intractable on May 23, 2000. (Tr. 238).

Plaintiff's treating physicians referred to his minor seizures as "break through seizures," "staring spells," or "complex partial seizures." The ALJ finding that "while the claimant may experience some back pain and seizure episodes, these appear to be well controlled with medication and the absence of alcohol," is not supported by objective medical evidence. (Tr. 41.) Plaintiff had stopped drinking by April, 2000. (Tr. 219, 227.) Plaintiff's treating physicians at the V.A. did not ascribe his continuing minor seizures to alcohol, as evidenced by the fact that they prescribed heavy doses of Dilantin, Neurontin, and other anti-convulsants for him. Plaintiff's treating physicians at the V.A. never describe his minor seizures as "well controlled" by the anti-convulsants. Rather, one of his treating physicians described the seizures as "intractable." (Tr. 238.) Additionally, the treating physicians increased his anti-convulsant medication frequently in attempt to control the seizures. (Tr. 128, 186, 190, 197-98, 200, 215, 238-39.) From May to September, 2000, Plaintiff returned to the Neurology Epilepsy Clinic at the V.A. Hospital,[6] complaining of blurry vision, insomnia, and breathing problems. (Tr. 234- 35.) His minor seizures continued with staring spells and right hand fidgeting two to three times per week. (*Id.*) The doctor adjusted his medication. (*Id.*) The objective medical evidence shows that Plaintiff continued to have break through complex partial

---

[6] These medical records, dating from May 3, 2000, to September 7, 2000, were furnished after the ALJ conducted her hearing, but before her decision.

17

seizures and staring spells two to three times per week.

The ALJ erred by failing to recognize Plaintiff's ongoing complex partial seizures as severe despite his medication and to consider them in combination with his other severe impairments. Plaintiff's substantial rights were affected by this error.  Accordingly, on remand, the Commissioner must fashion a hypothetical question for a vocational expert that reasonably incorporates all of Plaintiff's disabilities, including Plaintiff's intractable complex partial seizures, for the period from February 1, 1999 to May 16, 2001.  *See Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

The ALJ discounted the post-hearing consultant's RFC, stating that the physician merely recorded what Plaintiff said he could do.  (Tr. 41-2.)  The consultant actually performed a physical examination of Plaintiff, and his findings were confirmed by his November 2, 2001 examination of Plaintiff that was submitted later.  (Tr. 18-23.)  The post-hearing examining neurologist's RFC was similarly ignored, despite his examination of Plaintiff.  (Tr. 232-33.)  Substantial evidence does not support the ALJ's finding that Plaintiff had the RFC to lift forty pounds occasionally or twenty pounds frequently, sit for at least six hours in an 8-hour work day, and stand and walk at least 6 hours in an 8-hour workday.  Plaintiff's substantial rights were affected by this error.

### C. Credibility Determination

The ALJ gave Plaintiff's subjective complaints "limited credibility."  (Tr. 41.)  In reaching this credibility determination, the ALJ found that Plaintiff's relatively few activities resulted from "personal choice."  (Tr. 41.)  The ALJ mentioned that Sue Davis gave the following testimony:

> [S]he had known the claimant for four years, and had seen him daily for two years. Mr. Boyd's eyes will get glassy during his "spells," and there will be less color in his face.  He does not respond or talk for five to fifteen minutes.  It will be twenty to forty five minutes before he is back to normal, and the claimant then will be tired for hours.  The witness takes his blood pressure, which is elevated during an episode.

18

(Tr. 38.)   In evaluating the intensity and persistence of a claimant's symptoms, the Commissioner will "consider all of the available evidence, including . . . statements from . . . other persons about how your symptoms affect you." 20 C.F.R. § 1529(c).  *See also* S.S.R. 96-7p.  In this case, the ALJ entirely failed to assess the hearing testimony of Sue Davis.  Moreover, despite the corroborating testimony of Ms. Davis and medical evidence from his treating physicians that Plaintiff had intractable complex partial seizures at least once a week,  the ALJ summarily rejected Plaintiff's allegations of the effects of his complex partial seizures.[7]  Additionally, the ALJ failed to address the effects of Plaintiff's episodes of memory loss and blurry vision on his ability to work.  Further, the ALJ failed to address Plaintiff's heavy doses of medication and their possible side effects.[8] "[T]he Commissioner is required to consider the 'type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms.'"  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999).  *See also* 20 C.F.R. § 404.1529(c)(3)(iv); S.S.R. 96-7p. Therefore, the Court finds wholly insufficient the ALJ's conclusory statements that Plaintiff's seizures are controlled by medication and by the absence of alcohol.  As such, the ALJ applied an incorrect legal standard in evaluating Plaintiff's credibility.

---

[7]  Ms. Davis explained that Plaintiff was unable to function normally for several hours after a partial complex seizure because of his fatigue and confusion.  (Tr. 328.)  The VE testified that a hypothetical person who had one or two episodes per week of 15 to 30 minute periods when he was totally uncommunicative, followed by a thirty-minute period when he was tired and disoriented, would not be able to maintain employment in the jobs identified as potential work by the ALJ.  (Tr. 336.)

[8]  The ALJ mentioned that there is no indication from the medical evidence that the medication side effects have been a matter of concern.  However, the *Physicians Desk Reference*, p. 2282 (53rd ed. 1999) lists a side effect of Gabapentin as fatigue.  Nevertheless, the ALJ attributed Plaintiff's relatively few daily activities to personal choice, without exploring the possible relationship between his fatigue and his heavy dosage of anti-convulsant medication.

**C.**      **Substantial Rights**

The Court must now assess whether those errors affected his substantial rights.  *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) ("This court will not vacate a judgment unless the substantial rights of a party have been affected.")  *See also Petty v. Commissioner*, No. 3:98-CV-0928-BC, 1999 WL 222366, at *7 (N.D. Tex. April 14, 1999) (applying the substantial rights analysis to the district court's review of a final decision by the Commissioner.)  For the following reasons, the Court concludes that Plaintiff's substantial rights have been affected.

The ALJ improperly picked and chose evidence that would support a finding that Plaintiff was not disabled.[9]  The ALJ improperly ignored Plaintiff's favorable evidence from consistent treating sources and his corroborating witness.  Additionally, the ALJ failed to discuss the evidence of Plaintiff's September 11, 2000 TIA.  The Court finds that Plaintiff's substantial rights were affected.

Plaintiff met his burden to show that the Commissioner's decision is not supported by substantial evidence and is contrary to law.  The errors affected Plaintiff's substantial rights.

_____

[9]  For example, the ALJ mentioned that when Plaintiff was asked to describe his pain, he only said that it "hurts."  (Tr. 40.)  Plaintiff's testimony was, "it hurts . . . sometimes so bad I cry."  (Tr. 318.)  The ALJ faulted Plaintiff, for "report[ing] his seizures as more significant to the doctor of internal medicine than he did to the neurologist, the specialist for the seizure disorder."  (Tr. 41.)  She also discredited him for describing events differently to different sources, such as describing his complex partial seizures at the hearing as "being in a daze" and telling a doctor that the episodes involved "staring, with picking at things."  The ALJ wholly failed to recognize that when Plaintiff had a partial complex seizure, he was non-responsive and didn't know what was happening.  He was dependent upon witnesses to tell him what had occurred.  This was corroborated by the records from Plaintiff's treating physicians at the V.A. Hospital and by his witness, Sue Davis.  Plaintiff had medically documented complex partial seizures which caused problems with his thought processing; yet, the ALJ discredited him because of his faulty thought processing.

Accordingly, the Commissioner's unfavorable decision is reversed and remanded for further consideration.

**IT IS SO ORDERED**, June 1, 2005.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE